Good morning, Mr. Leavitt. May it please the Court, Counsel, my name is Ryan Leavitt. I myself, along with Damian Cheronez, represent Ms. Kidd, the appellant on this appeal. On her behalf, we've raised quite a number of issues, all of which we respectfully submit require this Court to reverse her conviction and remand her for trial. But what I'd like to start with this morning is the Brady claim that we've raised. Can I ask you a threshold question? Of course. These errors, some of these errors, at least, that you raised were not preserved, correct? Correct. Okay. So you're here, you're proceeding under the theory of plain error? For some of the issues, some are broader than the rigorous Strickland claim. Brady standard I don't think particularly changes regardless of whether or not you can't preserve something that's not technically. But some are plain error, yes. So initially then you'll have to prove error to begin with before we get into plain error analysis, right? Yes, Your Honor. And what prong of the plain error diagnosis are you proceeding under? I think the one that jumps out, I mean, with respect to the expert testimony, there's an open question. I wouldn't submit that one was preserved. But generally speaking, that the evidence is closely balanced, that not that it was such a – in here it was such a magnitude note that it's actually quite provisional. All right. So with the Brady violation, your issue is the statement, the previous statement or the tape statement? There's two previous tape statements, yes, Your Honor. One is for K.B. explaining the witness in this case. Right. She had a BSI that was tendered that pertained to the charge of homicide. And that was tendered and that was introduced pursuant to Ward 1510. And it was also a couple weeks earlier, a prior BSI, that she was asked questions about all of these other alleged acts of domestic violence that were introduced pursuant to Ward 15-7.4. It was such a central part of the State's case. When this issue arose in the trial court, what was the remedy that was sought by the defendant at that time? There wasn't one. With respect to K.B.'s, I think it was March 18th BSI, that was tendered on April 25th, 2017, the second day of trial, during the lunch recess. It was tendered – so it was tendered after Bardeer, after opening session, actually after K.B. herself had testified. After Lee Kallmeier, I describe her as the foundation witness for the 11510 tape, testified as well. And the 11510 tape was introduced. So then the lunch recess happens. Apparently during that recess, it's on the record that it was tendered over by the State. Counsel the next day – I think it was the next day – puts on the record that he didn't have a chance to view the tape until that evening. He did not seek continuance or a mistrial based on it. Doesn't that affect the analysis? It certainly affects – I mean, there's a number of ways it affects the analysis. The one I would highlight is we've simultaneously brought this issue under the rubric of strickling, as a strickling claim, too. So one way or the other, I think we have to deal with prejudice, whether it's prejudice under strickling or materiality of the brief. So I'll jump into that point. We highlighted in our brief a significant number of the inconsistencies. Those that relate to the other crimes evidence that was introduced exhaustively and discussed exhaustively, as well as the charge coming up. In this case, I would submit it's one that came down to the jury accepting what the complaining witness testified to and deciding that she was telling the truth as opposed to not telling the truth. And the fact that she could not testify to a consistent narrative and counsel – had counsel had the prior reassigned time to make use of it, simply put, I think that's critical evidence that the jury needed to hear to be able to make a fair determination in this matter. And the same goes for – Now, did it – was it a contradicting statement or just – There were less impeachment by omission. It was – there were contradictory statements and impeachment by omission with respect to all that there was a prior incident involving burning with a curling iron that she claimed my client, Ms. Kidd, had done to her. There was what we call drowning by pushing her head down in the bathtub. There was other sorts of things involving being mean and also alleged acts of domestic violence committed by Ms. Kidd against her partner, now husband, Bryce Evans. And a lot of it has to do with just the narrative that Katie gave for those instances and the way the narrative shifted. Sometimes contradictory statements, sometimes – Didn't she withdraw one of those statements? The statement – there was one that she later sort of waffled on, and that was she was mad at Bryce Evans for throwing out his Xbox or something and hit him with things. Right. And then she – I don't remember exactly what – I mean, Ms. Kidd didn't look to – at that point, is there anything else that would have made her look less credible? Wasn't this a strategic choice by the lawyer not to really come down on Ms. Kidd in certain areas? So – And also, while you're – while I'm thinking of it, and you can pick up on this after you answer the first question, this TF was able to rebut a lot of this. And I know there was some argument, well, we didn't have the video, but TF lived with that. Wouldn't – wouldn't they have access to her? Sure. I'll say – I'll take the trial strategy first. Yeah. Remind me if I get off track. Yeah, yeah. I do want to answer that question. With respect – I mean, I'll take the trial strategy argument of the state advantage in a more broad brush. Yeah. With respect to all of the errors, quite frankly. And I think they really are interrelated here. I just knew this morning I would be jumping around because – Because you've been to our arguments before? Well, actually, this is my first report. And you know we're prepared. I'm sorry? Never. Yeah. But anyway, so with respect to trial strategy, I hope you're able to notice that the arguments the states are advanced on this point, they really – and I don't know what else to say except that they're trying to have things two ways. When they want to talk about materiality under Brady, or when they want to talk about prejudice under Strickland, or when they want to talk about the magnitude of a plain error, Katie is painted by the state as this compelling witness. They actually use the word she's formidable at trial to talk about how she's telling the truth for years and years. She's just this very credible witness who, in summary, hit a home run for the state, and these inconsistencies are minor and they just clamped off the hour and there are little consequences. Except when it comes to trial strategy and letting in – letting her testimony in about all these other alleged acts. At that point, if we have this credible, formidable witness talking about all these horrible things that Ms. Kidd supposedly did to her, I don't know how you could say that's objectively reasonable trial strategy. Then let me – I'll tell you why I think the argument is somewhat compelling. Isn't it true that the overarching theory – one of the overarching theories of the defense in this case is that all of these earlier allegations, all the things that she had said were part of a larger scheme orchestrated by Cayley to gain a tactical advantage because of the ongoing problems in the relationship? Why is that not a plausible theory? In – generally speaking, I wouldn't quarrel with that point, and that certainly was the defense's position. But at the same time, with respect to these other alleged acts of domestic violence, that video, which contained the bulk of the impeachment material for Cayley on those other alleged acts of domestic violence, again, wasn't tendered until mid-trial, until counsel had already filed a trial strategy, and so he had already cross-examined the complaining witnesses and given his opening statement to the jury. So it robbed him of the ability to weigh those things, to weigh the strategy that was put forth, versus taking another position and trying to contest it, because how could he? As we've highlighted with respect to the 7.1 – Section 7.4 evidence, there has to be a pre-trial determination. The statute presupposes it, and certainly the relative weight of those allegations is something – is something that the defense can take into account. But he just couldn't with respect to the litigants. I guess what we're trying to balance here is ordinarily other crimes evidence is restricted. Yes. Because we know it can be devastating to the defense. But given the theory of the defense that this was part of a larger scheme, doesn't that mute the impact of these other allegations? Because I think the defense attorney, to the non-enclosing argument, did she not accuse the minor of being an accusation machine? We've got to stop all these ongoing accusations. So all of these other things were somewhat muted by the defense theory itself. Ladies and gentlemen, she's saying all of these things, but so what? She's an accusation machine. You know, that puts your posture a little different than the average case where you don't have that theory. Certainly right. But I think, again, that comes back to the fact that here's all of this impeachment material with respect to those other crimes evidence that could have been elicited and could have, even if that's a theory and that's a reasonable strategy in terms of the larger overall theory of the case, something that certainly would have shifted the needle in this matter. Did defense address those enclosing arguments? He was able to argue the inconsistencies. Well, he never made use of the prior BSI. It was tendered mid-trial, and it was actually hidden to keep it out. The state argued about the relative weight of it, as I'm sure you'll hear, and tried to paint it as something that was credible. Again, we detailed for you why we think there's a number of inconsistencies. The one other point with respect to trial strategy I wanted to raise, and I'll come back to the TF question right after, is what we raised in our reply talking about the Supreme Court, the United States Supreme Court decisions in Bagley and August, and trying to figure out what trial counsel would have done in this setting now. We don't have a crystal ball. We don't have to go to Christmas Pass to take us back there and see how the trial strategy might have been different if we had both videos tendered before trial. And so what we have to do, what the Supreme Court instructs us to do in these situations, is to look at the requests that were made. And we know, and we highlighted for you, the numerous specific requests for this type of material and some of the representations made by the state, which turned out to be completely inaccurate, including an email saying there's just this one video. And so in terms of how we assess it and how we construct it, any open questions I think that your honors have about what was trial strategy and what could sort of excuse the Strickland claims based on trial strategy? Will those open questions, I think, have to be held against the state and they have to answer to those. You have a defense attorney, though. I know you're saying you're raising Strickland. But you have a defense attorney who, if you will, and in any case where a defense attorney kind of lays in wait and then doesn't object to this stuff, and then you come to the appellate court and you argue it. For instance, in this particular case, there was nothing really objected to with respect to some of this testimony. So we look at it, well, maybe it's trial strategy. We have case law that says, you know, you're inviting or acquiescing to some of these admissions, some of this evidence coming into your acquiescence to this behavior. Now you're going to come in on appeal and raise it. How would you distinguish the case law with respect to that position? Certainly. I think the first thing I would suggest your honors look at is, with respect to the other crimes evidence, looking at the Supreme Court case law, as your honor pointed out, this type of evidence is sort of a bomb. It's very volatile. It carries a very high potential for prejudice, right? And the Supreme Court of Illinois has only upheld Section 115-7.4 based on the fact that these constitutional safeguards are provided right there in the statute and that these things happen. You gave a jury instruction. They gave a jury instruction on it, didn't they? No. That's one of the issues we raised. Oh, they didn't? There should have been a limiting instruction. Well, let's talk about that because I think that statute allows this to come in to show propensity. Does it not? It does. So why would you need a limiting instruction? Well, for two reasons. I think, one, the State didn't actually put it forward for propensity. Two, propensity in and of itself is a limited purpose, still much more akin to other 404B purposes, albeit broader, but it is still a limited purpose. What improper purpose would they use the other crimes for? Yeah. What could be worse than saying it's for propensity? Is there anything worse? Well, that's – I see you rely on banks and Heller. Yes. Well, there's a number. I mean, and it's not just on the substance of the question itself of instructing the jury what they can use it for, but it's also on the question of telling the jury the weight that they get attributed to this evidence, right? And so – Wait a minute. You're going to tell the jury the weight? Isn't it up to the jury to determine the weight that they get? Telling the jury precisely that. Not telling them the weight. Telling them that they get to decide. The weight is what I meant to say. Okay. Thank you. But still, even so, propensity, like I was saying, it is a more limited purpose, I would submit, and it's certainly not the completed elements of the offense, right? It just seems like it's hard to find a more improper or a more damning purpose that the jury could ever consider that evidence for other than propensity. Right. Well, there's still the issues, too, that relate to the charge conduct and that they consider the propensity for whether or not she committed the charge conduct, how that relates to the elements of the offense, what they – that they get to attribute weight to certain evidence, all those things. And in any event, I think that they didn't – the State ultimately didn't put forward this evidence for propensity. That's my opinion, but if you look through the record, I think it's well supported. They never make an argument along those lines. They make the argument that essentially using this stuff as a form of prior consistent statement to bolster the testimony of their complaining witness, who their case essentially hinged on. So I hear the beeping. Do you want to address anything else before you move on, before you sit down? Just – there was the point about T.F. and her BSI that you're on the case. Yeah. How was that error? I mean, you had access to T.F. So – It was her parents, right? That's correct. But I don't think it's supported actually by the record that they were aware of her involvement based on Katie's allegations in these different events to the extent that they were. They certainly did not have access to the BSI. And I can't – I couldn't pinpoint it for your honors in the record. I think there's a point where the defense tried to foil this because they did in fact know that she had been taken to the DCFS. And they knew she was interviewed. She's Ms. Kidd's daughter, but they didn't know what she was interviewed about. And there's a lot of custody madness going on. But you say a normal parent wouldn't have asked her any questions about it? I think regardless of what she maybe should have done, I think the point is that Brady places an affirmative obligation on the state, right? And we don't discharge it because a parent is probing as they should have. That much is true. It may be relevant to the overarching question of prejudice, but that much is true. The state has an affirmative burden irrespective of anything else. Yes, Your Honor. And just the last point I'll just mention on the TF, BSI. I think it's critical to recognize that this is a witness who K.D. put at the scene of nearly all of the other alleged acts of domestic violence and eventually put in the room at the time of the incident for the charged conduct. And here is a videotaped statement of this minor TF in the state's possession. So with that, I'd ask Your Honor, if there's any other questions, then I'll save the rest of my time for the public. Okay. Thank you. Thank you. Thank you. Mr. Trejo. May it please the Court, Counsel, Adam Trejo, on behalf of the people of the State of Illinois, defendant first claims that a Brady violation occurred. They kind of assume in their brief that this evidence would have been admitted. They don't argue under what section. Well, it doesn't – it's not necessarily whether it's admissible. It's just whether they should have it. Correct. And there's evidence that they did have it. On October 18th, 2017, one week before the trial, before the trial commenced, the defendant filed a motion, an amended motion to disclosure. And that's found in the record, page 1388. And in that motion, he discussed a 10-page police report that he received as a result of a FOIA request. And inside that FOIA and inside that police report, there were references to the TF, BSI, and the KDBSI. Was this issue ever argued at trial? No, because the defendant didn't object to it. On the first day of trial, he received notice, allegedly received notice, of the March 2014 BSI. That night he reviewed it. He could have filed a motion to continue. He didn't because it was part of his trial strategy. You're saying it's not true that defense counsel had no knowledge of this interview? Correct. We believe there was in the post-trial proceedings. The State properly pointed out that they filed an amended motion of disclosure with reference to police reports. And in that police report contained information regarding the – So they had to dig through the police report to determine whether or not there was a tape. That's part – not necessarily that they had to dig into it, just that they were – they had documents at their disposal to have notice of this. But moreover, the defendant was arguing that – I'm just going to stop you there, though, since this is hanging in the air. Do you have any case law that supports the fact that the State is excused from attending Brady material because it's referenced somewhere in a police report? No. That doesn't relieve the state of the burden, but there's also evidence that the State wasn't involved. They weren't participants in the VSI. But did they use the VSI to their benefit throughout the trial? Well, they attempted to, but the trial court didn't. The State held a motion to admit the March 2014 VSI interview, and they did not admit it. The trial court said it was not admissible. Furthermore, the trial court stated that the April 1, 2014 VSI was inadmissible under Section 115-10 because under that section, that applies to out-of-court statements made by victims. TF is not a victim. Furthermore, TF was not present at the party, contrary to what the defendant claims in his appellate brief. TE was present at the party, not TF. Moreover, the reason why they wanted to unappeal defendant asserts that these videos were necessary as part of their argument. They're arguing that they would have impeached Katie. There was multiple evidence brought on by the defense that already did this. For example, four defense witnesses, they testified. We had Jamie Kidd, defendant's mom. She said that Katie told her that Katie's mom makes her lie and say the defendant does bad things to her. If she does not lie, Katie's mother locks her in a room and hits her in the stomach. The trial fact heard this. Alyssa Kidd testified. Katie said that her mom makes her lie and say untrue things about defendant. Bryce Evans said, yes, Ms. Gardner, the DCFS investigator, told him that Katie told Ms. Gardner that the mother had instructed her to lie. Mrs. Smith, Mr. Evans' mother, said Katie has been told by her mom that to lie. So those inference, the impeaching evidence is not really that important when you already have the defendant bringing that out on his case in chief. So are you saying no prejudice? No prejudice because we already have that information. We already have the information that Katie – we have witnesses stating that Katie is lying, that she's been instructed by her mother to lie, which is consistent with trial strategy, meaning that there's a repeated pattern of false accusations. And the defendant tried to verify these claims by bringing on these court defense witnesses. Let me ask you this. Weren't there some alleged inconsistencies or actual consistencies in how Katie reported the drowning incident in the death house? Wouldn't that have had some impeachment value? Yes, but it would have been already familiar to – well, here's the thing. The defendant already brought out testimony by the DCFS investigator that these incidences, the burning incidences and the drowning incidences, were unfounded. The trier of fact already heard testimony that there was no evidence to support a claim of abuse or neglect. So they're already hearing evidence that, you know what, these prior allegations, they were not substantiated by DCFS, nor did they lead to prosecution. Was that argued by the defense in closing argument? I can't recall. As a non-victim attorney, that just doesn't pop out. But, yes, the trier of fact did receive information that Katie had been lying, had been instructed to lie, and also received information that the prior incidences described in those two VSI interviews, they were unfounded, meaning no clear evidence of abuse or neglect. Now, turning over to the jury instruction. Well, just one second before we go there. Yes. So just to make sure I have your position clear, are you conceding that it was error, but you're saying there's really no prejudice because of the cumulative nature of the impeachment that was already there? Or are you still saying that it was an error? Well, there's no concession of error because, one, the defendant never objected to it. They never said, hey, this caught me off by surprise. Hey, this would have been useful. They never filed a motion to continue. They never tried to alter the strategy as a result. Right, but that's the reason why he's raising plain error. Well, here, like I said, there's evidence that he did have information of these VSI interviews, and also he did have information of those incidences. If he's calling the DCFS investigator regarding these incidences, he knows that they have occurred. He knows that they've been unfounded. He knows that they happened. And he's not contesting it because of the old-version theory that it benefits his trial strategy. Correct. To show that this is a scheme brought on by him. Correct. And some of the inconsistencies are collateral matters. The fact that she was eating pancakes doesn't really matter as far as the specifics. Some of the inconsistencies, as I said, they were collateral issues. Now, as far as offering a limiting jury instruction on the other crimes of evidence? Did the other crimes of evidence become a theme for the State as the defendant points out? They state it became a quote-unquote focal point of this case. Based on the individuals that the State called, the State never really heavily relied on, like, the other crimes of evidence because it only came in through K.D.'s testimony. The State brought on six State witnesses, and K.D. stated, yes, I had been drowned by the defendant. Yes, she burned me. But she also testified to the events of April 29th of the strangulation. Then the State brought on other witnesses that didn't really testify to the other crimes of evidence. Monique Helmer testified to her interview regarding the strangulation. That BSI was admitted. Sarah Hoker, 115-10 witness, she testified about her interview regarding the strangulation. Judy Daughtery, K.D.'s maternal great-grandmother, she testified to the events that she dropped her off at the party, picked her up, noticed marks on her neck. Officer Jonathan Miller testified to the April 30th BSI, which was admitted. He also testified that marks were consistent with her fingerprint impressions. So when you look at the State's evidence as a whole, the other crimes of evidence wasn't emphasized beyond K.D.'s testimony. So, no, I wouldn't say that the other crimes of evidence was the focal point of the State's evidence or really case in chief when you look at the witnesses that the State brought on and called. As far as the limiting jury instruction, again, the defense counsel didn't object. He never requested for an instruction. Furthermore, the other crimes of evidence wasn't just admitted for propensity. It was admitted under 115-7.4, and under that statute, other crimes of evidence is admitted for any relevant purpose. So what is your argument in defense counsel's argument that a limiting instruction is not necessary because it comes in for any relevant purpose? Well, nothing suggests that jurors must be instructed as to all the ways in which the evidence may be relevant. And particularly in Heller, in that case cited by the defendant, the jury was instructed that they consider other crimes of evidence on the issues of factual similarity and proximity in time. So you're limiting what the jury can hear, but the public held that that was error because they could have considered that evidence under any relevant purpose. That's why they found error, because the limited instruction was too limiting. Here, when it's admitted under this section, it's under any relevant purpose, including propensity. And as this Court asked the defendants, they can't really come up with a definitive answer as to what type of instruction would have been more prejudicial than an instruction on propensity, which was admitted for. Fine. Any other questions? The people of the Settlement Alliance respectfully request that this Honorable Court uphold defendant's conviction. Thank you. Thank you. Back up, Mr. Lubbock. Thank you, Your Honor. To Justice Spence, your question earlier that I think she touched on last as to what other improper purposes there are besides propensity. Well, just considering the defendant a bad person, finding her guilty because she's a bad person who did these bad things, is different than propensity to commit a crime, right? There's a nuance between those two things I would submit. And that's certainly one of them. And we did actually propose an instruction to the trial court when we came on to understand how our counsel reported on this. Modifying from banks and how an instruction that would have been appropriate, we made it part of our brief as well. It's a non-IPI ticket. It's a non-IPI instruction. It's modified to the facts of this case based on the one given by the Supreme Court in banks. The other point I'd like to come back to, I had mentioned before with regards to trial strategy about how I think the State is trying to have two ways here about what Katie was as a witness, how credible she was versus how credible she was not. And you just heard again that there was no prejudice. This time, when talking about prejudice, she was not credible. Whether or not she was credible, the State conceded that she was impeached. She was impeached by numerous defense witnesses, they told you. And therefore, any inconsistencies in this prior reassignment would have just been cumulative. At trial, the State argued... But in the opening statement, the defense attorney argued that there's a lot of inconsistencies. You're going to hear about a lot of inconsistencies. Didn't he argue that in the opening statement? I'm not sure, but I don't doubt you. He said there are allegations that have been made before. Many of these allegations have been made before. And the way he put on in the case to try to rebut those is through a bunch of defense witnesses, such as Mr. Evans' mother, Miss Kidd's sister, Miss Kidd's mother, a bunch of family friends. I think that one of them was a neighbor as well that testified. The State got up there and closed an argument. And I think they said then, and certainly during the cross-examination of those witnesses, they got up and told the jury, these are all Miss Kidd's friends and family. But you have the DCFS people and didn't have, I don't know, was it a teacher or somebody? There were other people who said that this girl made things up. I think, but not specifically going through the other less-than-experienced domestic violence. And the point is the State, in turn, impeached these witnesses, whereas this prior VSI contained K.D.'s own words in a very relaxed setting that's with these models and where she was asked open-ended questions. There is no substitute for her own words when it comes to impeachment. This Court, I think, certainly knows that. So are you saying, and you have to be saying because of Strickland, but for the admission of these, or lack of admission of these videos, the results would have been different? Yes, Your Honor. And it's, we're making that claim and then we're also making that as part of our cumulative claim for cumulative action. Cumulative error, right. The last point I had regarding these questions was just, we didn't dispute that T.F.'s video in and of itself wouldn't have been admissible, but that it would have led to the discovery of admissible evidence. Because the point is we'll take it. 11510 applies to the parties, which is that. Correct. And that's, I don't see how that aids the State's position that they failed to tender this video, they failed to make it part of a 11510 hearing, and that, therefore, it somehow was inadmissible and it's the fault of the defense who didn't even have access to this video. And just because the State couldn't use it substantively in their case and sheet for the purposes that 11510 authorizes, doesn't mean the defense shouldn't have been able to use it to impeach, had they had the time to go through it, had it been time to tender it, as we submitted it should have been. So with that, thank you, Your Honor, for your time and your attention. Yes, thank you. And I see you've reversed Ms. Kidd's conviction and were made a permanent trial. Thank you again. Thank you. Good job on your first oral argument, and both of you, great job. Thank you so much for your arguments here today. We will take this case under consideration and render a decision in your favor.